Ilan S. Schoenberger, Esq. County Attorney, Rockland
You have asked whether the County of Rockland may prohibit the sale and use of styrofoam products within the county.
Your office has informed us that Rockland County is currently experiencing a rise in the amount of solid waste generated by its residents together with a dwindling availability of landfill space. Inasmuch as polystyrene or "styrofoam" products contribute significantly to this problem, the county is contemplating banning their sale and use within the county as a means of extending the existing life of its landfills. In addition to the landfill problems posed by styrofoam, your office has informed us that some types of styrofoam, when incinerated, release highly toxic gases. Other types form a residue that is very difficult to process.
By now it is clear that local governments have the power to enact regulations to protect the health and safety of their residents. Every local government is empowered to adopt and amend local laws relating to the government, protection, order, conduct, safety, health and well-being of persons and property in the local government (NY Const, Art IX, § 2[c]; see also, Municipal Home Rule Law, § 10[1][ii][a][12]). Local laws which seek to protect the environment fall squarely within this grant of police power (Matter of Frew Run Gravel Products, Inc. v Town of Carroll, 71 N.Y.2d 126 [1987]; Jancyn Mfg. Corp. v County of Suffolk, 71 N.Y.2d 91 [1987]).
There are, however, limitations on this grant of authority. A municipality may not adopt local laws: (1) which are inconsistent with the State Constitution or a general State law (Municipal Home Rule Law, § 10[1][ii]; Consolidated Edison Co. v Town of Red Hook, 60 N.Y.2d 99
[1983]; People v Cook, 34 N.Y.2d 100 [1974]; Wholesale Laundry Board vCity of New York, 17 A.D.2d 327 [1962], affd 12 N.Y.2d 998 [1963]); and (2) where the Legislature has expressed an intent to preempt local legislation with respect to a given subject (Consolidated Edison v Townof Red Hook, supra; Wholesale Laundry Board v City of New York, supra;People v DeJesus, 54 N.Y.2d 465 [1981]; People v Cook, supra; Robin vIncorporated Village of Hempstead, 30 N.Y.2d 347 [1972]).
In the past, we have found that the police power authorizes local governments to ban all glass beverage containers in municipal parks (1985 Op Atty Gen [Inf] 58); and to ban, subject to Commerce Clause considerations, the presence and use of highly dangerous toxic chemicals within the municipality (1986 Op Atty Gen [Inf] 91). In addition, a recent decision of the Court of Appeals recognized a municipality's authority to prohibit the use and sale of certain cesspool additives which were found to have a harmful effect on the community's groundwater (Jancyn Manufacturing, supra).
There is no doubt that the proposed ban on styrofoam is intended to further the health, safety and welfare of persons and property within Rockland County and thus would be within the scope of the delegation of home rule power (see 1986 Op Atty Gen [Inf] 91). Furthermore, the local law is not inconsistent with any provisions of New York's Constitution or general laws; nor is there any indication to date that the Legislature has preempted regulation in this area. There are no Federal laws which preempt the proposed ban on styrofoam.
The authority for such a regulation having been established, you have also asked us to address the question of whether the regulations run afoul of the Commerce Clause of the United States Constitution (US Const, Art I, § 8, cl 3). Because you have not established your proposed regulations in any detail, no firm conclusions can be reached but we will provide you with some general guidelines.*
In Huron Portland Cement Co. v City of Detroit (362 U.S. 440 [1960]), the Supreme Court set forth the standard for determining the validity of local environmental regulations which affect interstate commerce:
 "Evenhanded local regulation to effectuate a legitimate local public interest is valid unless pre-empted by federal action [citations omitted], or unduly burdensome on maritime activities or interstate commerce . . ." (362 US at 443).
In Huron, a Detroit ordinance which regulated the amount and density of smoke discharged within the city was challenged as violative of the Commerce Clause. A cement company regularly delivered products to the city via steamship. While in the harbor, the steamships discharged an amount of smoke in excess of that allowed by the city's anti-pollution ordinance. Compliance with the ordinance would require substantial changes to the company's ships. After rejecting the cement company's claim that the Federal government, by licensing and inspecting the company's vessels had preempted this area, the Court found that local regulations, which are based on the police power and which do not discriminate against interstate commerce do not violate the Commerce Clause (Huron, 362 US at 448).
In determining whether a local regulation is "unduly burdensome" on interstate commerce, the Supreme Court has set forth a test which requires the comparison of the competing interests of the local regulation and unrestricted interstate commerce:
 "If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. . . ." (Pike v Bruce Church, Inc., 397 U.S. 137, 142 [1970]).
Pike involved a challenge to an Arizona law which required cantaloupes grown within the state to be packaged within the state. The purpose of the statute was to protect and enhance the reputation of Arizona's produce industry. The law was challenged by an Arizona cantaloupe grower whose packing facilities were located in California. The only way the company could comply with the in-state packaging requirement was to construct a new packing facility in Arizona at a cost of $200,000. The court found that the nature of the state's interest — to promote the reputation of Arizona canteloupe growers (at the expense of one particular grower) — did not justify the burden placed on interstate commerce (Pike, 397 US at 145).
In general, the Court has been reluctant to strike down local regulations which serve safety and public welfare purposes because of their impact on interstate commerce. "It is difficult at best to say that financial losses should be balanced against the loss of lives and limbs of workers and people using the highway" (Brotherhood of Locomotive Firemen Enginemen v Chicago, Rock Island Pacific Railroad Co., 393 U.S. 129,140 [1968] [state may require minimum crews on freight trains]; Head vNew Mexico Board of Examiners in Optometry, 374 U.S. 424, 428-429
[1963]; Southern Pacific Co. v Arizona, 325 U.S. 761, 782 [1945]; seeProctor and Gamble Co. v Chicago, 509 F.2d 69 [7th Cir, 1975] [city may ban use of phosphate detergents]; American Can Co. v Oregon LiquorControl Commission, 517 P.2d 691 [Ore, 1973] [Oregon "Bottle Bill" which, inter alia, banned pull-top cans]).
In Minnesota v Clover Leaf Creamery Co. (449 U.S. 456 [1981]), the Supreme Court addressed the Commerce Clause implications of a Minneosta law which banned the use of plastic jug milk containers. The purpose behind the Minnesota law was similar to the county's reasons for banning styrofoam:
 "The legislature finds that the use of nonreturnable, nonrefillable containers for the packaging of milk and other milk products presents a solid waste management problem for the state, promotes energy waste, and depletes natural resources" (Minn Stat § 116F.21 [1978]; see 449 US at 458-459).
The law was challenged as unconstitutional on the ground, inter alia,
that it placed an undue burden on interstate commerce. After finding that the comparative test of Pike was applicable, the Court found that the Minnesota statute did, in fact, regulate evenhandedly, and was not a disguised form of state protectionism (Clover Leaf Creamery Co.,449 US at 471-472). The Court then found that the incidental burden imposed on interstate commerce by the regulation was not clearly excessive in relation to the putative local benefits (Clover Leaf Creamery Co.,449 US at 472-473).
Local regulations banning certain goods or activities have been found to be consistent with the Commerce Clause, as long as the regulation served a valid purpose and the importance of that purpose outweighed the burden placed on interstate commerce. These regulations were upheld even though the product or activity which was banned was legal in neighboring states or communities. State regulations which prohibited the importation of livestock unless burdensome quarantine procedures were complied with have been upheld against Commerce Clause challenges (Mintz v Baldwin,289 U.S. 346 [1933]; Asbell v Kansas, 209 U.S. 251 [1908]; Reid vColorado, 187 U.S. 137 [1902]). The state's interest in preventing the spread of communicable diseases among livestock outweighed the burden the quarantine procedure placed on interstate commerce. Later Court decisions upheld a state's right to ban totally the manufacture and importation of alcoholic beverages (Kidd v Pearson, 128 U.S. 1 [1888]; Mugler v Kansas,123 U.S. 623 [1887]).
In Proctor and Gamble Co. v Chicago (509 F.2d 69 [7th Cir], cert den421 U.S. 978 [1975]), a Chicago ordinance banned the use of phosphate-based detergents within the city. Phosphate-based detergent had been found to promote the growth of nuisance algae in the drinking water of the city and neighboring communities (id., 509 F.2d at 73-74). After establishing that the elimination of algae was a valid purpose, and that the ordinance legitimately served that purpose, the court discussed at length the impact the ordinance had on interstate commerce. Proctor and Gamble argued that the ordinance imposed an impermissible burden on them in several ways: (1) by impairing the normal operation of companies having interstate sales and caused these companies to create new, and less direct, shipping routes; (2) the potential for conflicting legislation in different states; (3) the ordinance was in fact an embargo on a safe, useful and unique product of commerce without any corresponding local benefit; and (4) the ordinance had an extraterritorial effect because of the warehouse marketing system employed by the major wholesale purchasers of detergents. These wholesale purchasers refused to "double slot" Proctor and Gamble's detergents, i.e. — refused to separate them into phosphate and non-phosphate versions of the same detergents (id., 509 F.2d at 76-79). The result of this refusal to double-slot certain detergents was to deprive certain communities, whose local regulations permitted the use of phosphates, from obtaining the phospate-based version.
The court found none of these descriptions of impact to be unduly burdensome, at least not to the extent that they outweighed the city's interest in eliminating algae from its water supply: the objection as to the disruption of shipping routes was rejected as not being a bona fide burden on interstate commerce, but only "a burden on a company which happens to have interstate distribution facilities" (Proctor and Gamble,509 F.2d at 77).* The court rejected the objections based on the possibility of conflicting legislation and the embargo argument as unsupported by the record (id., 509 F.2d at 77-78).
Finally, with regard to the distribution of phosphate-based detergents to communities where it was permitted, the court initially noted that this "burden" was an unintended and incidental burden (509 F.2d at 78). The court also noted that the inability of wholesalers to carry the product was questionable, and that a major manufacturer such as Proctor and Gamble had certain "leverage" to encourage wholesalers to carry the products (509 F.2d at 78).
A regulation which seeks to prohibit the use of a product, and which is facially neutral as to whether the product originated in-state or out-of-state, is much more likely to survive a Commerce Clause challenge. In Proctor and Gamble, Clover Leaf Creamery and the temperance cases (Kidd and Mugler), the regulations sought to ban products (phosphate-based detergents, plastic milk jugs, alcoholic beverages) because of their perceived harmful effects. The product's state of origin did not enter into the equation used to determine whether it should be banned. Compare these results with Philadelphia v New Jersey (437 U.S. 617
[1978]), where a New Jersey law banning the importation of solid or liquid waste which originated or was collected outside the territorial limits of the state was struck down as violative of the Commerce Clause. The Court found that although the purpose behind the New Jersey statute — to protect New Jersey's environment by slowing the flow of wastes into the state's landfills — was valid, the means used to carry out this purpose were protectionist and violative of the Commerce Clause (Philadelphia, 437 US at 626-627).**
Thus, an absolute ban of an item does not, by itself, raise any Commerce Clause problems. These cases are illustrative of a state or local government's power to ban products which it finds to be undesirable. As long as a valid public purpose is behind the ban, and the incidental burden placed on interstate commerce is not too great, the ban should survive Commerce Clause scrutiny.
We conclude that a county, using its home rule powers, is authorized to regulate the sale and use of styrofoam within the county. It is necessary, however, to consider the impact of the Commerce Clause of the United State Constitution upon such regulations.
* We note that the question of whether Suffolk County's partial ban on the use of styrofoam within the county has been challenged on Commerce Clause grounds, in litigation currently in Suffolk County Supreme Court (The Society of the Plastic Industry, Inc. v The County of Suffolk, Index No. 88-11262).
* See also, Exxon Corp. v Maryland (437 U.S. 117, 125-127 [1978]) for a discussion of the distinction between a burden on interstate commerce and a burden on companies that engage in interstate commerce.
** For further discussion of the constitutionality of protectionist and facially-neutral legislation see Maltz, How Much Regulation is TooMuch — An Examination of Commerce Clause Jurisprudence, 50 George Washington Law Review 47 (1981); Regan, The Supreme Court and StateProtectionism: Making Sense of the Dormant Commerce Clause, 84 Michigan Law Review 1091 (1986).