LONG ISLAND LIGHTING COMPANY, Respondent, v COUNTY OF
SUFFOLK et al., Appellants, et al., Defendants.

Second Department, August 22, 1986

**APPEARANCES OF COUNSEL**

*Skadden, Arps, Slate, Meagher & Flom (Jonathan J. Lerner* of counsel), and *Paul Sabatino, II,* for appellants. (One brief filed.)

*Shea & Gould (Michael Lesch, John G. Nicolish* and *Barry V. Sautman* of counsel), and *Anthony F. Earley, Jr. (Susan E. Silverman* of counsel), for respondent. (One brief filed.)

*Sive, Paget & Riesel (David Sive, Eric Bregman* and *Lawrence A. Goldberg* of counsel), for Citizens' Committee For A Long Island Power Authority, *amicus curiae.*

**OPINION OF THE COURT**

Per Curiam.

On July 28, 1986, the Suffolk County Legislature enacted Resolution No. 850 of 1986, authorizing the formation of a local development corporation pursuant to Not-For-Profit Corporation Law §§ 402 and 1411. The local development corporation, to be known as the Consumer Electric Corporation of Long Island (hereinafter the CEC), was incorporated for the purpose of, *inter alia,* acquiring the stock and/or assets of the Long Island Lighting Company (hereinafter LILCO) and to provide for the management and operation of LILCO subsequent to its acquisition. Pursuant to the county resolution, the CEC is empowered to issue negotiable bonds and other obligations in order to finance the acquisition of LILCO. Moreover, the CEC is to exercise its discretion in determining whether the acquisition of LILCO will result in lower rates and to withhold its authorization of any acquisition if such lower rates cannot be attained. Finally, under the county resolution, in the event of an acquisition of LILCO, the CEC is mandated

to "forthwith close and decommission the Shoreham [Nuclear Power] plant" and take "any and all actions to terminate, discontinue and preclude all pending, current or future licensing proceedings before the Nuclear Regulatory Commission (NRC) for the Shoreham Nuclear [Power] Plant".

On July 24, 1986, four days prior to the adoption of the Suffolk County resolution, Governor Cuomo signed into law legislation adding a title 1-A to Public Authorities Law article 5 (L 1986, ch 517) which authorized the acquisition of LILCO by an entity to be known as the Long Island Power Authority (hereinafter LIPA) *(see,* Public Authorities Law § 1020-c). The "legislative findings and declarations" set forth in Public Authorities Law § 1020-a state that "[t]here is a lack of confidence that the needs of the residents and of commerce and industry in [LILCO's] service area for electricity can be supplied in a reliable, efficient and economic manner by [LILCO]". Public Authorities Law § 1020-a further states that "excessive costs and lack of confidence have deterred commerce and industry from locating in the service area" and that "[t]he investment of LILCO in [the] Shoreham nuclear power plant has created significant rate increases, straining the economic capabilities of ratepayers in the service area". The legislative determination declares that "[f]or all the above reasons, a situation threatening the economy, health and safety exists in the service area". Public Authorities Law § 1020-a concludes that "[s]uch matters of state concern best can be dealt with by replacing such investor owned utility with a publicly owned power authority".

To effectuate this objective, Public Authorities Law § 1020-c creates LIPA, defined as "a body corporate and politic and a political subdivision of the state, exercising essential governmental and public powers". Public Authorities Law § 1020-h (1) (a) specifically empowers LIPA to acquire LILCO. Pursuant to Public Authorities Law § 1020-h (1) (b), LIPA must, prior to acquisition, enter into negotiations with LILCO for the purpose of acquiring the utility on terms which would result in rates equal to or less than rates which would result if LILCO were to continue in operation. Public Authorities Law § 1020-h (2) provides that as a prerequisite to the acquisition of LILCO's stock and/or assets, LIPA must determine, "in its sole discretion", based upon engineering, financial and legal data, studies and opinions, that the rates projected to be charged after the acquisition will not be higher than the rates projected by LILCO if the acquisition does not take place.

Significantly, Public Authorities Law, article 5, title 1-A also provides for the decommissioning of the Shoreham Nuclear Power Plant (see, Public Authorities Law § 1020-h [9]). Pursuant to Laws of 1986 (ch 517 § 11), however, the substantive provisions of Public Authorities Law, article 5, title 1-A do not become effective until January 15, 1987.

On the same day that the county resolution was approved, LILCO commenced the instant action seeking, *inter alia,* to declare the resolution invalid and to enjoin its implementation. By order to show cause dated July 30, 1986, LILCO moved for a preliminary injunction. Thereafter, by notice of motion dated August 4, 1986, the appellants sought dismissal of the LILCO complaint. By order dated August 8, 1986, the Supreme Court, Suffolk County, granted the plaintiff's motion for a preliminary injunction upon the ground that the county resolution had been preempted by the State's enactment of Public Authorities Law, article 5, title 1-A. After comparing the Suffolk County resolution and Public Authorities Law, article 5, title 1-A the court, in its memorandum decision, concluded that "[t]here is no doubt, from the language employed by the authors of Title 1-A, that the State intended to acquire LILCO by itself". The court further observed that "[t]he fact that the timetable and the method is slower than the plan invented by the Suffolk County Legislature is no reason to disregard the State's pre-emption in this area". On August 11, 1986, this court modified the preliminary injunction so as to allow the appellants to continue with certain internal preparatory steps for the proposed bond sale by the CEC and directed that the instant appeal be heard on an expedited basis. The principal issue now before us is whether the Supreme Court was correct in enjoining implementation of the Suffolk County resolution. We conclude that it was, and accordingly we affirm.

We begin by rejecting the appellants' argument that we must remain indifferent to the objectives of, and the legislative intent disclosed by, the enactment of Laws of 1986 (ch 517), adding title 1-A to Public Authorities Law article 5 solely because the framers of that legislation thought it provident to delay the implementation thereof until January 1987. To circumscribe our substantive inquiry in such a fashion would be to adopt a myopic and unacceptable narrow impediment to the ascertainment of legislative intent. Nor do we subscribe to the appellants' contention that, as a matter of law, the substantive implications and objectives of Public

Authorities Law, article 5, title 1-A cannot be assessed in terms of their potentially preemptive scope until after the effective date of Laws of 1986 (ch 517). Suffice it to say that, where an intent to preempt is discernible, the adoption of such a contention could, conceivably, frustrate legislative discretion in gauging the most efficacious juncture at which statutorily mandated acts should be performed. In short, we conclude that the Legislature's decision to delay implementation of Public Authorities Law, article 5, title 1-A does not preclude our inquiry into the question of whether the county's resolution has been preempted.

Turning to the substantive preemption issue, it is well settled that although "[m]unicipalities have broad powers to enact local legislation concerning the health, safety, welfare and morals of its residents" they nevertheless are limited in their enactments by "the preclusion against the adoption of local laws which are preempted by State legislation" *(Dougal v County of Suffolk,* 102 AD2d 531, 532, *affd* 65 NY2d 668). Moreover, "[w]here a State law indicates a purpose to occupy an entire field of regulation, local regulations are pre-empted regardless of whether their terms conflict with provisions of the State statute or only duplicate them" *(Matter of Ames v Smoot,* 98 AD2d 216, 218). It is also settled that, "[t]he intent to pre-empt need not be express. It is enough that the Legislature has impliedly evinced its desire to do so" *(Consolidated Edison Co. v Town of Red Hook,* 60 NY2d 99, 105). As further stated by the Court of Appeals, "[a] desire to pre-empt may be implied from a declaration of State policy by the Legislature * * * or from the fact that the Legislature has enacted a comprehensive and detailed regulatory scheme in a particular area" *(Consolidated Edison Co. v Town of Red Hook, supra,* at p 105). Indeed, this court has noted that "[c]omprehensiveness and detail are important in determining the existence of an intent to pre-empt" *(Matter of Ames v Smoot, supra,* at p 220). Moreover, even where the Legislature has not preempted the field, Suffolk County's "authority to enact local laws under the Constitution or the Municipal Home Rule Law is conditioned on the exercise of such authority not being inconsistent with any State enactment" *(Consolidated Edison Co. v Town of Red Hook, supra,* at p 107). "While [the] two infirmities [of preemption and inconsistency] are often interrelated, each is in itself a sufficient basis for invalidating a local law" *(Consolidated Edison Co. v Town of Red Hook, supra,* at p 105).

Our review of the record discloses that Public Authorities

Law, article 5, title 1-A is a detailed, highly comprehensive, special enactment pursuant to which the power authority created thereunder is specifically authorized to perform the function of acquiring LILCO and transforming it from a private, investor-owned utility into a publicly owned power authority. We reject the contention that the county-initiated acquisition is compatible or consistent with the acquiring function to be exercised by the statutorily created LIPA.

The language of Public Authorities Law, article 5, title 1-A buttresses our conclusion in this respect. Significantly, Public Authorities Law § 1020-c creates LIPA for the express purpose of effectuating the policies declared in Public Authorities Law § 1020-a, paramount among which is "replacing such investor owned utility with a publicly owned power authority". Moreover, Public Authorities Law § 1020-h states, in pertinent part, that,

"1. The legislature hereby expressly finds and determines:

"(a) The acquisition *by the authority* [i.e., LIPA], through purchase or the exercise of the power of eminent domain, of either the securities or assets of LILCO * * * is the most appropriate means of dealing with the emergency involving the economy, health and safety of the residents and the industry and commerce in the service area" (emphasis added).

Further, Public Authorities Law § 1020-h (1) (n) states that "[s]uch an acquisition *by the authority* * * * serves the public purposes of assuring the provision of an adequate supply of gas and electricity in a reliable, efficient and economic manner and retaining existing commerce and industry * * * all of which are matters of state-wide concern" (emphasis added). The characterization of the LILCO situation as a "state-wide concern" is repeated elsewhere in the statute. For example, in Public Authorities Law § 1020-a, it is specifically stated that "[d]ealing with [the LILCO] situation in an effective manner * * * [is] hereby expressly determined to be [a matter] of state concern * * * Such matters of state concern best can be dealt with by replacing such investor owned utility with a publicly owned power authority".

The appellants nevertheless argue that the acquisition of LILCO by an entity other than LIPA is ultimately consistent with the underlying objectives of Public Authorities Law, article 5, title 1-A since, *inter alia,* acquisition by the CEC will facilitate the decommissioning of the Shoreham Nuclear Power Plant. They further theorize that the CEC's acquisition

of LILCO is not inconsistent with LIPA's acquiring of LILCO since LIPA can simply purchase the utility from the CEC. In fact, as the appellants note, the county resolution specifically authorizes cooperation with LIPA and even the sale of the CEC's assets to LIPA. These contentions are not, however, persuasive. Although Public Authorities Law, article 5, title 1-A authorizes LIPA to, *inter alia,* transfer its assets to private utilities or to a municipal gas or electric agency (Public Authorities Law § 1020-f [t]), to cooperate and to enter into contractual arrangements with municipalities with respect to the construction, improvement, rehabilitation, ownership and/or operation of generating facilities (Public Authorities Law § 1020-g [k]), and to cooperate with private utilities and public entities in connection with transmission facilities (Public Authorities Law § 1020-g [j] [iii]), these and other provisions of Public Authorities Law, article 5, title 1-A furnish no evidence supportive of the contention that the Legislature anticipated or authorized the initial acquisition of LILCO by an entity other than LIPA.

Moreover, we reject the contention that the county's resolution is consistent with Public Authorities Law, article 5, title 1-A because the CEC, if permitted to proceed, will acquire LILCO immediately and preclude the commissioning of the Shoreham Nuclear Power Plant. As Justice Geiler observed: "[t]he fact that the time table and the method is slower [under title 1-A] than the plan invented by the Suffolk County Legislature is no reason to disregard the State's pre-emption in this area". Furthermore, in addition to the previously identified conflict in connection with the acquiring function to be exercised by LIPA under Public Authorities Law, article 5, title 1-A we note certain additional inconsistencies in the two enactments. For example, title 1-A requires LIPA to enter into negotiations with LILCO prior to exercising its power of eminent domain to acquire LILCO's stock or assets (*see,* Public Authorities Law § 1020-h [1] [b]), whereas the county resolution imposes no such requirement upon the CEC prior to the acquisition of LILCO's stock or assets.

Perhaps more significantly, in approving Laws of 1986 (ch 517), Governor Cuomo stated that "[w]hile ratepayer savings are the touchstone for any decision to proceed with public power, these savings should not be achieved at the expense of ratepayers in other regions of the State" (Governor's memorandum on approving L 1986, ch 517, at 2). In this respect, it is notable that pursuant to Public Authorities Law § 1020-q

(2), LIPA is required to make payments in lieu of taxes that would otherwise be imposed upon LILCO under, *inter alia,* Tax Law §§ 186, 186-a, 186-b and 186-c. The present value of the State's right to receive those tax payments from LILCO in the future has been estimated at approximately $900,000,000, and obviously, the actual receipts would be far in excess of that sum. Under the county plan the CEC, as a not-for-profit corporation, would be exempt from such taxes *(see,* Not-For-Profit Corporation Law § 1411 [f]), thereby resulting in a substantial savings. The savings, however, would only be to the CEC's ratepayers, and the resulting loss of tax revenues to the State would have to be shouldered by all its taxpayers.

Public Authorities Law, article 5, title 1-A moreover, also prohibits LIPA from acquiring preference hydroelectric power *(see,* Public Authorities Law § 1020-cc), whereas no such prohibition is contained in the county resolution. The Governor's approval memorandum notes with respect to hydroelectric power that "[m]ore importantly, under this bill, the Authority is specifically precluded from requesting or obtaining an allocation of preference hydroelectric power from the Power Authority's Niagara and St. Lawrence projects. Therefore, under the bill, ratepayers on Long Island or a Long Island Power Authority will not obtain access to low cost hydropower at the expense of ratepayers in other parts of the State". Clearly, the differing treatment accorded these significant issues by Laws of 1986 (ch 517) and the county resolution represents a marked inconsistency in important areas of substantive policy.

In short, we find no basis whatsoever to assume that the framers of Laws of 1986 (ch 517) anticipated a peremptory municipal initiative when their own comprehensive enactment creates a State-acquiring authority and characterizes the acquisition of LILCO as a matter *of State-wide* concern. It is not, moreover, ameliorative of the inconsistency between the county resolution and Public Authorities Law, article 5, title 1-A to offer, as a palliative, the contention that ultimately LIPA may acquire LILCO from the CEC. The language of the State legislation discloses that the State has determined that it must assume the not inconsiderable task of initially acquiring LILCO and transforming it from a private, investor-owned utility to a publicly owned power authority.

There can be little question that the State Legislature intended to confer upon LIPA the exclusive authority to acquire LILCO and that Public Authorities Law, article 5,

title 1-A necessarily occupies the field in connection with such acquisition. Thus, we conclude that implementation of the Suffolk County resolution was properly enjoined.

In light of our decision, we do not reach the remaining issues raised by the parties.

Accordingly, the order appealed from should be affirmed, without costs or disbursements.

MOLLEN, P. J., MANGANO, BROWN, RUBIN and KOOPER, JJ., concur.

Order of the Supreme Court, Suffolk County, dated August 8, 1986, affirmed, without costs or disbursements.